**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRENDA A. ANDERSON,** | : | **CIVIL ACTION NO. 3:10-CV-0423** |
| **Plaintiff,** | : | |
| | : | **(NEALON, D.J.)** |
| | : | **(MANNION, M.J.)** |
| **v.** | : | |
| | : | |
| **MICHAEL J. ASTRUE,** | : | |
| **Commissioner of** | | |
| **Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. §§ 405(g) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Disability Insurance Benefits ("DIB") under the Social Security Act, ("Act"). 42 U.S.C. §§ 401-433, 1381-1383f.

## I.   PROCEDURAL HISTORY.

The plaintiff in this matter, Brenda A. Anderson, seeks judicial review of the Commissioner's denial of her claim for DIB. (Doc. 1). The plaintiff protectively filed an application for DIB on April 3, 2003, alleging disability since December 13, 2002, due to hypertension, diabetes, fibromyalgia, asthma, osteoarthritis, and chronic fatigue. (TR. 40, 55). The claim was

denied initially by the Agency and the plaintiff requested an administrative hearing. (TR. 40). The plaintiff appeared at a hearing held on March 14, 2005 before Administrative Law Judge ("ALJ") Landesberg. (TR. 531-565). The plaintiff was represented by counsel and a vocational expert provided testimony. (*Id.*)

On April 28, 2005, the ALJ issued a decision denying the plaintiff's claim. (TR. 45-51). The plaintiff requested review of the ALJ's decision and the Appeals Council granted the plaintiff's request for review. (TR. 53-54). The Appeals Council remanded the case for further proceedings because the plaintiff submitted additional evidence which suggested she may have been suffering from a severe mental impairment before the expiration of her insured status on December 31, 2004. (*Id.*)

On July 18, 2006, ALJ Landesberg held a second hearing. (TR. 566-596). The plaintiff, who was represented by counsel, a vocational expert and medical expert each provided testimony. (*Id.*). On September 14, 2006, the ALJ again denied benefits to the plaintiff, finding that she could perform a limited range of sedentary work. (TR. 24-36). On May 31, 2007, the Appeals Council denied the plaintiff's request for reopening. (TR. 686-687). However

when it was discovered that evidence had not been admitted into the record before the Appeals Counsel denied the request for reopening, on September 21, 2007, the Commissioner filed a Motion to Remand, which was granted on October 1, 2007. (TR. 690, 693-695, 692).    On October 18, 2007 upon remand from the United States District Court for the Middle District of Pennsylvania, the Appeals Council remanded the case to a new ALJ to evaluate the plaintiff's disability and consider the additional evidence. (TR. 689-699).

On January 23, 2008, a third hearing was held with ALJ Wesner where the plaintiff, who was represented by counsel, testified along with her spouse and a vocational expert. (TR. 792-834). On February 27, 2008, the ALJ issued a decision finding that the plaintiff was not disabled because she was able to perform a limited range of sedentary work. (TR. 624-638). The Appeals Council denied the plaintiff's request for review, making the ALJ's decision final. See 42 U.S.C. §405(g).

At issue before this court is whether substantial evidence supports the Commissioner's decision that the plaintiff was not disabled because she was capable of performing a limited range of sedentary work prior to the date

when her insured status expired for purposes of disability insurance benefits.

## II.   STANDARD OF REVIEW.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988)*; Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.*" Pierce v. Underwood*, 487 U.S. 552 (1988)*; Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999)*, Johnson*, 529 F.3d at 200. It is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §432(d)(1)(A). Furthermore,

[a]n individual shall be determined to be under a disability only if [his] physical or mental impairment or impairments are of such severity that [he] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [he] lives, or whether a specific job vacancy exists for [him], or whether [he] would be hired if [he] applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

## III.    DISABILITY EVALUATION PROCESS.

A five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. §404.1520. See also *Plummer v. Apfel*, *186 F.3d 422, 428 (3d Cir. 1999).* If the Commissioner finds that a plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. See 20 C.F.R. §404.1520.

The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or

equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §404.1520.

Here, the ALJ proceeded through each step of the sequential evaluation process and concluded that the plaintiff was not disabled within the meaning of the Act. (TR. 624-638). At step one, the ALJ found that the plaintiff has not engaged in substantial gainful work activity at any time during the period from her alleged onset date of December 13, 2002 through her date last insured of December 31, 2004. (TR. 626). At step two, the ALJ concluded that the plaintiff's impairments (osteoarthritis, mild asthma, obesity, mitral valve prolapse and fibromyalgia) were severe within the meaning of the Regulations. (TR. 626). The ALJ found that the plaintiff also suffered from non-severe hypertension, diabetes and mental disorders at the time of her date last insured. (TR. 627). At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4. (20 C.F.R. §404.1520(d), §404.1525 and §404.1526).

(TR. 630).

The ALJ found at that the plaintiff has the residual functional capacity ("RFC"), to perform a restricted range of sedentary work. (TR. 631). At step four, the ALJ found that through the date last insured, the plaintiff was unable to perform her past relevant work. (TR. 636). At step five, the ALJ concluded that considering the plaintiff's residual functional capacity, age, education and work experience, there were significant jobs in the national economy that the plaintiff could perform. (TR. 638).

The ALJ therefore concluded that the plaintiff had not been under a disability, as defined in the Act, at any time from December 13, 2002, the alleged onset date, through the date of last insured, December 31, 2004. 20 C.F.R. §§ 404.1520(g). (TR. 638).

## IV.    BACKGROUND.

The plaintiff was born on October 12, 1951 and was fifty-three (53) years old on the date last insured. (TR. 636). She is therefore considered an individual closely approaching advancing age. 20 C.F.R. §404.1563. The plaintiff has at least a high school education and is able to communicate in

English. (TR. 636).

The plaintiff, a mother of two grown children, lives with her second husband, a retired military man. (TR. 484). She testified that her husband receives Social Security disability as well as disability benefits from Veterans Affairs. (TR. 534).

The plaintiff has past relevant work experience working as a mystery shopper and a self-employed bulk mailer. (TR. 636). As a result, the plaintiff has acquired the following skills: supervisory skills, instruction of others, record keeping, phone work, promotional sales work, a wide range of clerical skills, and bookkeeping. (TR. 636).

At the first administrative hearing held on March 14, 2005, the plaintiff stated that she closed her bulk mailing business around the same time she married her husband because she was unable to perform the heavy lifting that the job required. (TR. 535, 539-540). The plaintiff stated that after she gave up her mail business, she helped her sister do part-time cleaning two days per week and was paid in cash. (TR. 544). She chose the disability onset date of December 13, 2002 because that is when her physician wrote a note for her. (TR. 539).

The plaintiff testified that she can no longer sit at a computer. (TR. 542-543). She also stated that she did gardening, cleaned windows, paid bills with her husband's assistance, continued to drive and did some cooking. (TR. 546, 553-554). She stated that it was difficult to lift her arms up in the air but stated she could do her hair. (TR. 554).

The plaintiff testified that her husband has post-traumatic stress disorder ("PTSD") and that she attends counseling sessions with him because "it can really affect the marriage ..." (TR. 546). She did not allege that she had ever been diagnosed with PTSD. (TR. 546-557).

At the second administrative hearing held on July 18, 2006, the ALJ noted that the plaintiff sought treatment for her mental health after she received an unfavorable decision in April of 2005. (TR. 569). The ALJ asked medical expert Rudolph Janosko, M.D., a psychiatrist, to opine on whether the new evidence that was submitted subsequent to the April 2005 decision showed that the plaintiff had a disabling impairment. (*Id.*) Dr. Janosko took into account the new evidence, including a report submitted by P. Kirk Pandelidis, M.D., the plaintiff's medical history during the relevant period, and diagnoses of dysthymic disorder, generalized anxiety disorder, and histrionic

personality disorder six months after the plaintiff's date last insured. (TR. 572-575). However, he noted that there was no real psychiatric data in the plaintiff's file before that independent examination. (*Id.*).

Dr. Janosko noted that the plaintiff had a GAF score of 50 when she first saw her physician in June of 2005, after her insured status expired.[1] (TR. 486). In August of 2005, after she started her medication, she had a GAF score of 65. (TR. 496). In addition, Dr. Janosko testified that the plaintiff had "no significant exacerbation of emotional" illness during the period in question and has never carried a diagnosis of a major illness such bipolar disorder, major depression, ischemia, etc. (TR. 579).

---

[1] A GAF score, or a Global Assessment Functioning scale, takes into consideration psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness and is not supposed to include the consideration of impairment in functioning due to physical (or environmental) limitations. The scale ranges from the highest score of 100 to the lowest score of 1. A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A GAF score between 61-70 denotes mild symptoms such as depressed mood and mild insomnia or some difficulty in social, occupational or school functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).

On January 23, 2008, at the third administrative hearing, the plaintiff testified that she performed work as a mystery shopper. (TR. 798-799). She stated that her depression became worse from her fibromyalgia after her father passed away on May 2, 2003, but that she did not seek treatment because none of her physicians suggested that she see a therapist. (TR. 805, 817).

The plaintiff's husband testified that the two were married for eight years and that the plaintiff had never recovered from her father's death. (TR. 819). He also stated that they employed a cleaning lady because of the plaintiff's fibromyalgia and depression. (TR. 820).

The vocational expert testified that the plaintiff's experience as a mail clerk constitutes light, exertional work in the national economy and that the plaintiff performed the job at the medium exertional level. (TR. 824). The vocational expert also stated that the position of a mystery shopper is performed at the light exertional level. (*Id.*). The vocational expert further testified that the plaintiff had transferable supervisory, instructional, monitoring and record keeping skills from her past relevant work which could be transferred to sedentary work. (TR. 829).

## V. DISCUSSION.

The plaintiff presents a mixed series of arguments alleging that the ALJ erred in reaching the conclusion that the plaintiff is not disabled. They are as follows: 1) The ALJ failed to give appropriate weight to opinions of treating sources; 2) The ALJ erroneously discounted all evidence which did not already exist as of the DLI, in violation of SSR 83-20 and the remand order; 3) ALJ Wesner wrongly relied on the testimony of the prior medical expert, who did not have much of the evidence; 4) The ALJ failed to evaluate properly the credibility of the claimant's family; 5) The ALJ wrongly held that Plaintiff's mental impairments were not severe at Step Two or disabling before her DLI; 6) The ALJ wrongly held that the claimant could utilize transferable skills; 7) The ALJ wrongly determined the claimant's RFC and failed to include any of the claimant's mental limitations in his hypothetical questions to the VE; 8) The ALJ's findings of fact and conclusions of law are not supported by substantial evidence; 9) The proper remedy in this case is outright reversal, not remand.  (Doc. 14 at 11).

The defendant argues that the plaintiff is not disabled and that the ALJ correctly determined that the evidence from the relevant period, which ended

on December 31, 2004, was insufficient to show that the plaintiff had disabling mental or physical impairments. (Doc. 22 at 1). The defendant asserts that the ALJ thoroughly considered the evidence from the relevant period as well as additional evidence submitted by the plaintiff after two prior ALJ decisions found that she did not have a severe mental impairment during the relevant period. (Doc. 22 at 2).

The issue now before us is whether substantial evidence supports the Commissioner's decision that the plaintiff was not disabled because she could perform a limited range of sedentary work prior to the date when her insured status expired. Based upon the record and for the reasons stated below, it appears that there is substantial evidence to support the Commissioner's decision that the plaintiff is not disabled.

## A. The ALJ properly evaluated the opinions of the plaintiff's treating physicians.

The plaintiff argues that the ALJ failed to accord the appropriate weight to the opinions of her treating physicians, specifically rheumatologist Carole A. Dorsch, M.D. and Puneet K. Gupta, D.O.. (Doc. 14 at 12-13). Contrary to this assertion it appears that the ALJ properly evaluated the medical source

opinion evidence.

The Court of Appeals for the Third Circuit set forth the standard for evaluating the opinion of a treating physician in the case of *Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000)*. The Court stated:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer* [v. *Apfel,* 186 F.3d 422, 429 (3d Cir.1999)] (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); see also *Adorno v. Shalala,* 40 F.3d 43, 47 (3d Cir.1994); *Jones,* 954 F.2d at 128; *Allen v. Bowen,* 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen,* 861 F.2d 405, 408 (3d Cir.1988); *Brewster,* 786 F.2d at 585. Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plumme*r, 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. See *Adorno,* 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own

credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent*, 710 F.2d at 115.

*Id.* at 317-318.

Similarly, the Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," it is to be given controlling weight. 20 C.F.R. § 416.927(d)(2). When the opinion of a treating physician is not given controlling weight, the length of the treatment relationship and the frequency of examination must be considered. The Regulations state:

> Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non-treating source.

20 C.F.R. § 416.927(d)(2)(I).

Additionally, the nature and extent of the treatment relationship is

considered. The Regulations state:

> Generally, the more knowledge a treating source has about your
> impairment(s) the more weight we will give to the source's medical
> opinion. We will look at the treatment the source has provided and
> at the kinds and extent of examinations and testing the source has
> performed or ordered from specialists and independent
> laboratories. For example, if your ophthalmologist notices that you
> have complained of neck pain during your eye examinations, we
> will consider his or her opinion with respect to your neck pain, but
> we will give it less weight than that of another physician who has
> treated you for the neck pain. When the treating source has
> reasonable knowledge of your impairment(s), we will give the
> source's opinion more weight than we would give it if it were from
> a nontreating source.

20 C.F.R. §416.927(d)(2)(ii).

In the instant matter, the ALJ thoroughly considered the opinions of the plaintiff's physicians, including the opinions of treating physicians Dr. Gupta and Dr. Dorsch.

The plaintiff was first seen by Dr. Gupta in October of 2003. (TR. 367-368, 634). The plaintiff advised Dr. Gupta that she had another family doctor between April of 2003 and the present but that she "didn't do well" with the changes he had made to her medications. (TR. 367). The defendant notes that

the plaintiff sought treatment from Dr. Gupta after her previous treating physician, Dr. Surry, refused to provide a note stating she was unable to perform sedentary work. (Doc. 22 at 34; TR. 295-296).

Dr. Gupta concluded that the plaintiff's diabetes and hypertension were well controlled, that she had palpitations, anxiety, osteoarthritis and fibromyalgia by history. (*Id.*)

Dr. Gupta saw the plaintiff again on November 7, 2003 for complaints of asthma. She was diagnosed with mild chronic asthma with slightly worsened control. (TR. 364).

On January 23, 2003, Dr. Gupta completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form. (TR. 361-363). Dr. Gupta indicated that the plaintiff could lift less than 10 pounds occasionally and frequently, that she was limited in her ability to push and pull with both the upper and lower extremities and to reach, handle, finger and feel. (*Id.*) He also concluded that the plaintiff had environmental limitations. (TR. 363).

On January 8, 2004, Dr. Gupta responded to questions from the plaintiff's attorney regarding her health condition and capacity to work. (TR. 359). She indicated that the plaintiff told her she lies down during the day to

relieve pain in her muscles and joints. Thus, she concluded that the plaintiff could not work eight hours per day for five days a week because her ability to stand, sit and/or walk for prolonged periods had been affected by fibromyalgia and osteoarthritis. (*Id*.) Dr. Gupta also stated that the plaintiff could sit for two to three hours or less in an eight hour workday and that she was not able to stand and/or walk for more than two hours in an eight hour workday. (Id.)

The plaintiff was seen again by Dr. Gupta on May 18, 2004, for complaints of left ear pain. (TR. 459). Dr. Gupta concluded that she might have swimmer's ear. (*Id*.).

On June 7, 2004, Dr. Gupta noted that the plaintiff was doing well, that she was pleased with her blood pressure, her sugars were controlled and her palpitations were kept to a minimum level. (TR. 455).

The following month on July 14, 2004, the plaintiff asked Dr. Gupta to fill out a form for her disability. (TR. 670). She stated that chronic fatigue syndrome and fibromyalgia were the main factors which were rendering her disabled. (*Id*.) She also claimed that she was prevented from performing "gainful employment" because she could not remain in one position for any extended period of time. (*Id*.)

On August 4, 2004, the plaintiff told Dr. Gupta that her fibromyalgia was stable but requested she complete another form certifying that she was disabled. (TR. 450).

On September 23, 2004, the plaintiff complained that she was suffering from muscle aches when she stopped using Singulair. (TR. 448). She denied having palpitations and Dr. Gupta noted that she was stable and had no major flare ups. (Id.).

On September 24, 2004, Dr. Gupta wrote a letter on the plaintiff's behalf stating that he switched her medication to Crestor because Lipitor previously caused myalgias that were generalized all over her body. (TR. 424).

The plaintiff saw Dr. Gupta on November 2, 2004 for a follow up appointment for her heart palpitations. (TR. 445). The plaintiff reported that her palpitations had disappeared and Dr. Gupta noted that her recent palpitation episode was resolved when the plaintiff used an inhaler. (TR. 445).

The plaintiff saw Dr. Gupta again on December 22, 2004 for a routine checkup where the plaintiff complained of high levels of stress and anxiety due to family relationship issues. (TR. 443). Dr. Gupta diagnosed the plaintiff with hypertension with slightly worsened control, situational anxiety and stress, type

II diabetes mellitus and hyperlipidemia. (TR. 443).

The plaintiff's date of last insured for purposes of DIB was December 31, 2004. She continued to see Dr. Gupta following this date. On March 30, 2007, Dr. Gupta wrote a letter explaining that he had treated the plaintiff for the past few years and that she suffered from fibromyalgia, anxiety, depression, chronic myofascial pain syndrome, asthma, hypertension and Type 2 diabetes mellitus, which is diet controlled. (TR. 677). As a result, Dr. Gupta concluded the plaintiff was disabled. (TR. 678).

The ALJ concluded that the limitations described by Dr. Gupta were not supported by the record. (TR. 634). He stated that Dr. Gupta's assessment of the plaintiff's limitations in her ability to reach, handle, finger or feel were supported by the record as it existed prior to December of 2004. (*Id*.) He noted that Dr. Gupta only began to treat the plaintiff in October of 2003 and that her progress notes through November of 2003 did not support the degree of limitation she endorsed. (*Id*.)

The ALJ stated that Dr. Gupta's blanket statements included in her July 2004 records were not a determination of disability. (*Id*.) Moreover, the ALJ stated that these opinions were not supported by the treatment notes of Dr.

Surry, who treated the plaintiff for approximately five years, did not think that the plaintiff was disabled in July of 2003, and was not willing to prepare statements that the plaintiff was disabled. (*Id*.) The ALJ stated, "I assign great weight to [Dr. Surry's] opinions as he treated the claimant for a substantial period of time and was well aware of her longitudinal history. I recognize that after he quit treating her, his opinions would be less probative of her functioning and therefore relied more on actual treating provider notes in December 2004 as to what her functioning was at that time than to the prior opinions of Dr. Surry." (TR. 633-634).

The Plaintiff also claims that the ALJ failed to accord the appropriate weight to the opinion of Dr. Dorsch, a rheumatologist. (Doc. 14 at 12-13). The ALJ noted that the plaintiff was referred to Dr. Dorsch after Dr. Surry, her initial primary care physician, could find no objective data to confirm the plaintiff's complaints of fibromyalgia. (TR. 632).

The plaintiff was first examined by Dr. Dorsch on January 6, 2003. (TR. 321). She complained of aching hands, stiffness in her neck and across her shoulder girdle, and pain after repetitive motion. (*Id*.) The plaintiff stated that her condition improved with mild activity and she reported she was doing a

regular exercise routine for the past six weeks. Dr. Dorsch noted that the plaintiff was able to sleep well and had a good level of energy, and that she helped her sister with routine housecleaning activities. (TR. 321-322). Dr. Dorsch concluded that the plaintiff likely had degenerative changes in her cervical spine and mild changes in hands, and that she had tenderness over fibrositic trigger points so that "a component of fibromyalgia could be considered." (TR. 323).

The plaintiff sought treatment from Dr. Dorsch again in June of 2003 for musculoskeletal pain. (TR. 324). Dr. Dorsch noted that the plaintiff had mild osteoarthritis and that an x-ray of the plaintiff's cervical spine and shoulders showed minimal degenerative changes. (TR. 324). After a physical examination, Dr. Dorsch concluded that the plaintiff had good mobility of her wrists, elbows and shoulders and that she had full range of motion of her hips and no swelling in her knees or ankles. (TR. 324).

On April 27, 2004, the plaintiff saw Dr. Dorsch for the purpose of completing her Social Security paperwork. (TR. 390). The plaintiff complained of diffuse muscle tenderness and Dr. Dorsch noted that she had some early degenerative changes in her hands without swelling, that she had a full range

of motion in her joints except for limitations in extending the cervical spine. (TR. 390). The plaintiff did not want to try a non-steroidal anti-inflammatory drug so Dr. Dorsch recommended water exercise. (*Id*.) Dr. Dorsch completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form, and concluded that the plaintiff could lift less than 10 pounds occasionally and frequently, that she could stand and/or walk less than 2 hours in an 8 hour day, that she could sit for 6 hours in an 8 hour day, and that she was limited in her ability to push and pull with both her upper and lower extremities. (TR. 372).

Dr. Dorsch cited the plaintiff's complaints of musculoskeletal pain, which was exacerbated by activities. (*Id*.) Dr. Dorsch outlined additional limitations for the plaintiff, stating that she could never climb stairs, crouch or crawl and that she was limited in her ability to reach in all directions. (TR. 372-373).

The ALJ stated that he assigned greater weight to the opinion of Dr. Dorsch, the plaintiff's treating rheumatologist, than to Dr. Gupta because she was a treating specialist, her opinion was better supported by the record, and she had a longer treating relationship at that time with the plaintiff. (TR. 634). The ALJ was careful to note that while he was not adopting the full opinion of

Dr. Dorsch, he would still support limiting the plaintiff to lifting no more than 10 pounds at a time. The ALJ did not incorporate the pushing and pulling limitations into the plaintiff's residual functional capacity assessment because they were not supported by Dr. Dorsch's treatment notes. (TR. 634).

**B. The ALJ properly evaluated the credibility of the plaintiff and her family members.**

Substantial evidence supports the ALJ's findings regarding the plaintiff's credibility and the credibility of her family members.

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir.1997); see also *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." *Frazier v. Apfel*, 2000 WL 288246 (E.D. Pa. March 7, 2000). "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Com. of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

An ALJ may find testimony to be not credible, but he must "give great weight to a claimant's subjective testimony of the inability to perform even light or sedentary work when this testimony is supported by competent medical evidence." *Id.*

Here, the ALJ found that the plaintiff's testimony as to the severity of her limitations was not credible. The ALJ made note of the fact that there were at least two occasions in which the plaintiff specifically sought treatment from doctors who were more sympathetic to her allegations of disability than from any physician who expressed doubts or had questions regarding the severity of her fibromyalgia. (TR. 632). On July 3, 2003, the plaintiff contacted the office of her treating physician, Dr. Surry, and told them that she needed a doctor's note which specifically said she was unable to work and unable to perform sedentary work. (TR. 632, 295-296). After Dr. Surry refused to provide this note, the plaintiff switched physicians within a few months. (*Id*.) Second, on August 10, 2004, a progress note written by Dr. Gupta indicated that the plaintiff did not want to see a specific physician because this physician had expressed that fibromyalgia "should not be that severe." (TR. 450). The ALJ stated, "Not only does this cause some inconsistencies in the record as not all

physicians considered her disabled, it raises questions about the claimant's overall credibility." (TR. 632).

The ALJ noted further that the plaintiff missed several appointments with her treating rheumatologist Dr. Dorsch. The ALJ stated that this did "not reflect well on her overall credibility as Dr. Dorsch would be a specialist in the area of fibromyalgia and the most likely to effectively treat this disorder." (TR. 633).

The ALJ also noted that he assigned great weight to the opinion of Dr. Surry, who treated the plaintiff for approximately five years and was aware of her longitudinal history. The ALJ opined that "most of the treatment notes do not reflect the degree of debilitating allegations that the claimant now alleges nor do they reflect the degree of severity noted by physicians that she is unable to work. Rather, the treatment notes as they existed during the period in question reflect an individual with pain issues that were somewhat refractory [to] treatment." (TR. 634).

The plaintiff also contends that the ALJ failed to properly evaluate the credibility of the plaintiff's family. (Doc. 14 at 16). The record contains affidavits prepared in 2008 by the plaintiff's husband, daughter and sister-in-law. (TR. 799-791). The ALJ assigned limited weight to these opinions "that basically

support the claimant is extremely debilitated and completely disabled and obviously unable to work." (TR. 635). The plaintiff argues, "ALJ Wesner made no credibility finding concerning the husband's testimony or the family's affidavits, except to note that they were prepared years later with attorney assistance." (Doc. 14 at 16).

However, the ALJ stated that he "relied more heavily on statements of the claimant actually made prior to her date last insured."  (TR. 635). He also added, "[a]ffidavits prepared several years later under the guidance of counsel to support the claimant's disability are less probative than the above in determining whether an individual is disabled." (*Id*.).

The plaintiff cites *Newell v. Commissioner of Social Security*, 347 F.3d 541, (3d Cir. 2003), where the court held that the ALJ failed to properly consider non-contemporaneous evidence presented by the plaintiff in order to perform a retrospective analysis. In *Newall*, the court made clear that a retrospective diagnosis of an impairment, even if uncorroborated by contemporaneous medical records, but corroborated by lay evidence relating back to the claimed period of disability, can support a finding of a past impairment. (citing *Loza v. Apfel*, 219 F.3d 378, 396 (5th Cir. 2000); *Likes v.*

*Callahan*, 112 F.3d 189, 191 (5ᵗʰ Cir. 1997). *Id.* at 547. However, the facts in the instant matter differ from the circumstances in *Newall*. Here, the ALJ does take into account the statements made by the plaintiff's family members and provides sufficient articulation for his decision to assign little weight to these statements.

Moreover, in *Newall*, the court was attempting to determine the plaintiff's onset date of disability. There, the plaintiff stated she had not sought medical treatment because she was uninsured and that she had sought treatment when her father gave her the money to pay for it. *Id.* Thus, the court remanded the case to the Commissioner to obtain medical expert testimony. Here, there is no indication that the plaintiff could not afford to obtain mental health treatment during the relevant period. In fact, she was seen by numerous physicians and specialists.

The plaintiff also cites *Bennett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) in support of her argument that the ALJ erroneously discounted the testimony of her family members by failing to evaluate each witness individually. (Doc. 14 at 16). However, in Bennett, the ALJ failed to even mention the testimony of the plaintiff's husband and neighbor. *Id.* at 123.

Thus, the Third Circuit remanded the case and ordered the ALJ to address that testimony. Here, the ALJ adequately addressed the testimony of the plaintiff's family members, but discounted it for other reasons.

Moreover, even if the ALJ did err by not providing a more detailed analysis of his reasons for discounting the testimony of the plaintiff's family members, there is still substantial evidence to support the ALJ's overall credibility determination. The statements of the plaintiff's family fail for the same reasons that the plaintiff's fail, they are unsupported by the medical evidence.

Thus, the ALJ considered the entire record and gave specific reasons for his decision to assign limited weight to the statements of the plaintiff and her family members. Substantial evidence supports the ALJ's decision.

**C. The ALJ was not required to consider evidence that did not pertain to the relevant period.**

The plaintiff argues that Social Security Ruling 83-20, 1983 WL 31249 mandates that the ALJ is required to consider evidence that post-dated the relevant period. (Doc. 14 at 13-14).

SSR 83-20 states, in pertinent part:

In disabilities of non-traumatic origin, the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity ... With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling ... In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process. ... In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. In some cases, it may be possible, based on the medical evidence, to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination ... At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning the onset is available, such evidence should be secured before inferences are made ... Information may be obtained from family members, friends, and former employers. ... Social Security Ruling 83-20.

Here, the plaintiff applied for disability insurance benefits, and not supplemental security income.  If she had applied for both, the ALJ would have been required to determine whether she had become disabled at any time up

to the date of the ALJ's decision. However, the ALJ did not make a disability

determination for the period post dating the date the plaintiff was last insured.

The plaintiff argues, "if there is any possibility that the claimant is

currently disabled by an impairment that could possibly have existed as of the

date last insured, SSR 83-20 applies." (Doc. 28 at 3). The defendant argues

that because there was never a finding that the plaintiff was disabled, SSR 83-

20 is inapplicable. (Doc. 22 at 40).

However, we find that this argument is irrelevant and beyond the scope

of the issue at hand for multiple reasons. First, the purpose of SSR 83-20 is

"to state the policy and describe the relevant evidence to be considered when

establishing the onset date of disability." Here, it does not appear from the

record that the onset date of the plaintiff's alleged disability is in dispute.

Second, even if SSR 83-20 did apply to this matter, it would require the

ALJ to obtain testimony from a medical expert regarding the plaintiff's

impairments. The plaintiff argues that "any ME following the requirements of SSR 83-20 would have determined that Mrs. Anderson was too impaired from her alleged onset of 12/13/2002 forward to perform her prior semi-skilled work on a sustained basis." Here, the ALJ utilized the testimony from medical expert Dr. Janosko, who testified at the plaintiff's second administrative hearing. (TR. 572-575). Dr. Janosko considered evidence from the relevant period and subsequent to the relevant period and simply found no basis for relating the later evidence back to the relevant period.

Third, the ALJ considered all evidence from the relevant period and beyond, and adequately addressed any reports and evidence submitted subsequent to the plaintiff's date last insured. The ALJ noted, and Dr. Janosko addressed the testimony of Dr. Pandelidis, the psychiatrist who evaluated the plaintiff on June 23, 2005.

Furthermore, the ALJ had access to the evidence that the plaintiff insists was ignored making the determination that the plaintiff was disabled. Dr. Pandelidis found it "conceivable" that the plaintiff was depressed during that time. (TR. 609). Similarly, Dr. Stipe, who examined the plaintiff in September of 2005, did not give a definitive diagnosis of a mental disorder. Rather, he found it "possible" that the plaintiff was suffering from anxiety and depression in December of 2004. (TR. 526). The ALJ specifically stated that he considered Dr. Stipe's opinion that it was "possible" that the plaintiff had a mental health condition in December of 2004, but that he did not translate this statement to automatically mean that the plaintiff was suffering from anxiety and depression at that time. (TR. 635). The ALJ also noted that the "new" evidence he was instructed to consider upon remand in reality contained many duplicates of records already contained in the record and that much of the

evidence submitted for his review upon remand was for a period of time well after the plaintiff's date last insured. (TR. 635).

**D. Substantial evidence supports the ALJ's finding that the plaintiff did not have a mental impairment prior to her date last insured.**

The plaintiff argues that the ALJ erred in failing to make the required findings when evaluating her mental impairments. (Doc. 14 and Doc. 28). The plaintiff alleges that the ALJ erred in finding she did not have a severe mental impairment, that the ALJ had a duty to develop the evidence pertaining to her mental impairment and that the ALJ was not entitled to rely upon the testimony of medical expert Dr. Janosko, who testified at the plaintiff's second administrative hearing. For the reasons set forth below, we believe there is no merit to the plaintiff's argument.

If a claimant fails to show that his impairments are "severe," he is ineligible for disability benefits. *See Plummer v. Apfel*, 186 F.3d 422, 428

(3d Cir. 1999). The Regulations provide that a "severe" impairment is an "impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §404.1520.

Here, the plaintiff argues that the ALJ erred in determining that the plaintiff did not have a severe medical determinative impairment at step two of the sequential evaluation process. (Doc. 14 at 17).The plaintiff argues that the ALJ's findings that the plaintiff's mental impairments were not severe constitutes reversible error.  (*Id.*)

At step two, the ALJ must determine whether a claimant who is not currently performing substantial gainful work is suffering from a severe impairment. The burden is on the claimant to prove that her alleged symptoms are "severe" within the meaning of the regulations.  20 C.F.R. §404.1512.

In *Velazquez v. Astrue*, 2008 WL 4589831 (E.D. Pa. 2008), the Court stated:

> In order to meet the step two severity test, an impairment need only cause a slight abnormality that has no more than a minimal effect on the ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921; S.S.R. 96-3p, 85-28. The Third Circuit Court of Appeals has held that the step two severity inquiry is a *"de minimus* screening device to dispose of groundless claims." *McCrea v. Comm. of Soc. Sec.,* 370 F.3d 357, 360 (3d Cir.2004); *Newell v. Comm. of Soc. Sec.,* 347 F.3d 541, 546 (3d Cir.2003). "Any doubt as to whether this showing has been made is to be resolved in favor of the applicant." *Id.*

*Id*. at *2.

Here, the ALJ noted that the record occasionally referenced the plaintiff's affective disorder and anxiety prior to the date last insured. Dr. Pandelidis also provided a report in mid 2005 which supported these diagnosis. (TR. 627). However, there is substantial evidence which shows that the plaintiff's medically determinable dysthymia and anxiety were not severe

and did not cause more than a minimal limitation in her ability to perform basic mental work activities. (TR. 627).

The ALJ stated that the plaintiff voiced complaints of depression and anxiety to her treating physician in March of 2003, but the physician did not document any symptoms of a mental impairment. (TR. 240, 627). The ALJ noted that the plaintiff's physicians did not consider any mental impairment the plaintiff may have had severe enough to warrant mental health treatment. (TR. 240, 627).

The ALJ noted that the plaintiff attended counseling sessions with her husband, but that there was no corroborating evidence of any significant mental health problems prior to her date of last insured that were documented in the treatment notes submitted by Mr. Murray. (TR. 628; 474-481). Moreover, the ALJ stated and we note that the plaintiff was not Mr. Murray's

patient, she was merely attending the sessions with her husband.[2] (TR. 628).

The ALJ stated, "the issues at family counseling involved family matters,

relationship difficulties and problems with the claimant's irresponsible son. The

counseling notes reveal that the claimant was experiencing stressful

circumstances but she was functional and there was no indication of a

diagnosis of psychopathology." (TR. 628, 474-481). The ALJ assigned limited

weight to Mr. Murray's opinions because there was no corroborating evidence

of any significant mental health symptoms prior to the date last insured in the

medical records or in the treatment notes supplied by Mr. Murray. (TR. 628).

He stated, "The claimant saw numerous physicians frequently and there was

---

[2] We note that Mr. Murray is a social worker and does not qualify as an "acceptable medical source" pursuant to the Commissioner's regulations. 20 C.F.R. § 404.1513. Social Security Ruling 06-3p does not classify a social worker as an acceptable medical source. Rather, social workers fall into the category of "other sources" which "cannot establish the existence of a medically determinable impairment." Instead, information from "other sources" can be used to "provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." See 2006 WL 2329939 (2006) at *2.

no documentation during the relevant period by any treating source that she had disabling or work preclusive anxiety. Additionally, Mr. Murray never indicated in the session notes even after the date last insured that the claimant had any psychopathology symptoms or that she displayed any work preclusive anxiety symptoms." (TR. 628). Thus, the ALJ assigned limited weight to the opinions of Mr. Murray because they were not as probative as to the plaintiff's symptomatology during the relevant period. (TR. 628).

Moreover, it is important to note that the ALJ pointed out that Mr. Murray never recommended that the plaintiff seek mental health treatment. (TR. 628). None of the plaintiff's physicians ever referred her for mental health treatment, nor did the plaintiff ever seek mental health treatment on her own. She sought treatment from Dr. Pandelidis at the advice of her counsel. The ALJ considered the opinion of Dr. Janosko, a psychiatric medical expert who testified at the plaintiff's second administrative hearing. (TR. 629). Dr. Janosko

considered the evidence of record, including Dr. Pandelidis' 2005 report, the plaintiff's medical history during the relevant period, and the diagnosis of dysthymic disorder, generalized anxiety disorder and histrionic personality disorder after the date of the plaintiff's last insured. He opined that it was difficult to relate the evidence back because there was no real psychiatric data in the file before the independent examination. (TR. 572-575). The ALJ accorded Dr. Janosko's opinion great weight because it was consistent with the medical evidence. (TR. 629). The plaintiff argues that Dr. Janosko was missing much of the relevant evidence that post dated the plaintiff's date of last insured. However, this is incorrect as the record shows that Dr. Janosko did consider evidence from the period subsequent to the plaintiff's date of last insured, including the report of Dr. Pandelidis.

Dr. Pandelidis first evaluated the plaintiff on June 23, 2005 and diagnosed the plaintiff with dysthymic disorder and generalized anxiety

disorder. Dr. Pandelidis also opined that the plaintiff had a GAF score of 50.

However, the ALJ noted that while the plaintiff told Dr. Pandelidis she had

symptoms of anxiety since 2002, there is no medical evidence to document

that she was diagnosed with psychopathology or that she required treatment

during that time. Moreover, at the time of the evaluation, the plaintiff's cousin

had recently passed away and she was upset about her denial of social

security benefits. The ALJ stated, "Although the claimant may very well had

had a GAF Score of 50 when he met with her in June 2005, this was close to

six months after her date last insured. I do not find the record establishes that

the claimant had a GAF of 50 at or prior to her date last insured, especially in

light of Dr. Janosko's testimony in this matter." (TR. 629).

The ALJ also considered the four broad functional areas as set forth in

20 C.F.R. Part 404, subpart P, Appendix 1, which provides an analytical

framework of three functional areas to be rated "mild" or "none," and a fourth

area "none," to determine if a claimant's impairment is severe. The ALJ found that the plaintiff had mild limitations with regard to the first criteria, activities of daily living, mostly related to physical issues and pain. (TR. 629). The ALJ noted that the plaintiff did not make reference to any limiting mental impairments in her initial paperwork, but that anxiety was mentioned at her hearings. (TR. 629).

In the second area of social functioning, the ALJ found that the plaintiff had mild limitations because although she had strained family relationships, she appeared to get along well with her husband and daughter. (TR. 630). The ALJ noted that while she did allege some difficulty dealing with male doctors in private due to an alleged rape, she was treated by Dr. Surry for several years, until "he wrote letters that were not supportive of her getting disability due to fibromyalgia." (TR. 630).

The ALJ found that the Plaintiff had mild limitations due to mental impairments in the third area, concentration, persistence or pace, because her mental disorders were not treated, her physicians did not see a need to refer to her for mental health treatment and there was a limited discussion of her mental health issues on the record. (TR. 630).

Lastly, the ALJ found that the Plaintiff has had no extended episodes of decompensation. (TR. 630). Thus, the ALJ found that the Plaintiff's medically determinable mental impairments of anxiety and depression did not cause more than a minimal limitation in her ability to perform basic mental work activities. (TR. 630). The ALJ stated, "I find that the mental impairments were not severe prior to the date last insured as there was no medical documentation of any psychological symptoms or functional limitations or restrictions due to psychological symptoms." (TR. 630).

Moreover, the record is replete with evidence that the plaintiff was able to function despite any alleged severe mental impairment. For example, the plaintiff worked part-time at a cleaning job for her sister and as a mystery shopper during the relevant period, which show that her mental impairments were not so severe as to prevent her from engaging in basic work activities. See 20 C.F.R. §§ 404.1520(c), 404.1521(b). When the plaintiff was employed, she reported to work on time and had a good attendance. (TR. 192). In addition, the plaintiff's daily activities were not consistent with those of an individual who is suffering from a disabling, severe mental impairment. The plaintiff drove a car when necessary, paid her bills once a month, and did her own laundry and grocery shopping. (TR. 188-189). She had no difficulty going out in public and she attended holiday gatherings and visited her grandchildren.(TR. 191). She cooked, vacuumed, made her bed, and took care of the needs of her home. (TR. 200, 202, 493). There is also evidence that the

plaintiff hosted a Thanksgiving dinner at her home during the relevant period and was able to travel to Tennessee with her husband. This is hardly the portrait of an individual who is having difficulty with daily functioning due to a severe mental disorder.

The plaintiff's argument that the ALJ had a duty to develop the record is not based on facts or the law. Such a duty is manifested when the evidence is so ambiguous or inadequate for proper evaluation of a claim. As mentioned above, the plaintiff argues that SSR 83-20 mandates the use of a medical expert to set the onset date once the ALJ finds that a claimant is disabled. Regardless of whether SSR 83-20 applies, the record contains medical expert testimony from Dr. Janosko, which the ALJ adequately addressed. The plaintiff also claims that the ALJ was required to re-contact her treating physician but this argument is without merit because the evidence which the ALJ reviewed was not incomplete or inadequate and he did not require additional

information. [20 C.F.R. §404.1512(e)](); *[Skarbek v. Barnhart, 390 F.3d 500, 504](https://)* [(7th Cir. 2004)]().

**E. The ALJ properly determined the plaintiff's residual functional capacity and did not err in posing a hypothetical question to the vocational expert.**

In addition to the plaintiff's argument that the ALJ erred in failing to find that the plaintiff suffered from a severe mental impairment at step two of the sequential evaluation process, the plaintiff alleges that the ALJ further erred in not including these findings in the residual functional capacity assessment. Consequently, the plaintiff argues that the ALJ wrongly determined the plaintiff's residual functional capacity by finding that the plaintiff had transferrable skills and failing to include any of the plaintiff's mental limitations in his hypothetical questions to the vocational expert.

The fifth and final step of the sequential process requires an analysis of whether the Plaintiff, based on her age, experience, education, and residual

functional capacity and limitations, can perform any other work in the national economy. See *Plummer v. Apfel*, 186 F.3d at 428; *Burnett v. Comm. of SSA*, 220 F.3d 112, 126 (3d Cir. 2000). Thus, at this step, the Commissioner must demonstrate that the Plaintiff is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. §404.1520(f); *Plummer*, 186 F.3d at 428. In making a disability determination, the ALJ must analyze the cumulative effect of all of the Plaintiff's impairments. 20 C.F.R. § 404.1523; *Plummer*, supra.

Based on the testimony of two impartial vocational experts, the Administrative Law Judge concluded that, considering the Plaintiff's age, educational background, work experience, and residual functional capacity ("RFC"), she is capable of making a successful adjustment to work that exists in significant numbers in the national economy. (TR 637- 638). The ALJ found that the plaintiff had acquired work skills from past relevant work that were

transferable to other occupations with jobs that existed in significant numbers in the national economy. (TR. 638).

The plaintiff argues that the ALJ wrongly held that the plaintiff could utilize transferable skills. However, at the heart of the plaintiff's argument is the ALJ's RFC assessment. Once the ALJ makes factual findings regarding age, education, prior work experience and residual functional capacity, he then inputs this information into the Medical-Vocational Guidelines, known as the "grid rules." These rules were promulgated by the Social Security administration to guide an ALJ at step five.   See *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir.2000). ("The ALJ may use the Medical-Vocational Guidelines ("Grids") in making the step five determination.) The grids are characterized by the level of work that a claimant is capable of performing considering their exertional impairments: sedentary, light, medium and heavy.[3]

---

[3]The distinction between exertional and non-exertional limitations is discussed in 20 C.F.R. §404.1569a. Under that section, "[t]he classification of a limitation

The application of the grid rules at the last step is dependent on the ALJ's findings. It is the plaintiff's vocational and exertional characteristics which dictate what rule, if any, applies to the plaintiff. Those findings, if supported by substantial evidence, control the outcome. See *Frontanez-Rubiani v. Barnhardt*, 2004 WL 2399821 *3 (E.D. Pa. 2004).

The ALJ determined that the plaintiff was not disabled under the framework of Grid Rule 201.15. Grid Rule 201.15 provides that if a claimant closely approaching advanced age has done skilled or semiskilled work and has transferable skills, the claimant is not disabled.

---

as exertional is related to the United States Department of Labor's classification of various jobs by various exertional levels (sedentary, light, medium, heavy, very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing and pulling." 20 C.F.R. §404.1569a(a). When the restrictions affect the claimant's ability to meet job demands other than strength demands, the limitations are non-exertional. Examples of such non-exertional limitations are difficulty functioning because of nervousness, anxiety, depression, difficulty seeing, hearing, maintaining concentration and remembering. 20 C.F.R. §404.1569a.(c).

The plaintiff appears to argue that 201.14 applies, which is identical to 201.15, except that the claimant only needs to prove that her physical and/or mental impairments precluded sustained work or that her mental impairments precluded semi-skilled work. In other words, 201.14 addresses a claimant whose skills are not transferable to sedentary work and the plaintiff argues that this section is applicable to her. The plaintiff states, "The severity of the claimant's depression, anxiety, and a personality disorder was sufficient to prevent her from engaging in the supervisory skills, record keeping, instructing and monitoring promotional sales, bookkeeping and clerical skills identified by [the vocational expert]." (Doc. 14 at 17).

The plaintiff's argument is predicated upon the fact that ALJ Wesner and ALJ Anderson did not include the plaintiff's mental limitations in their questions to the vocational experts. Based on the testimony of two impartial vocational experts, the Administrative Law Judge concluded that, considering

the Plaintiff's age, educational background, work experience, and residual functional capacity ("RFC"), she is capable of making a successful adjustment to work that exists in significant numbers in the national economy. (TR 637-638). The ALJ found that the plaintiff had acquired work skills from past relevant work that were transferable to other occupations with jobs that existed in significant numbers in the national economy. (TR. 638).

The Third Circuit has held, with respect to hypothetical questions posed to vocational experts, that "[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). A hypothetical question posed to a vocational expert "must reflect all of a claimant's impairments." *Chrupcala v. Heckler*, 829 F.2d

1269, 1276 (3d Cir. 1987) (emphasis added). In *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002), the Third Circuit stated that "[w]here there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence." (citations omitted).

As previously discussed, the plaintiff has failed to show that she suffered from a severe mental impairment prior to her date last insured. Thus, the ALJ did not have a duty to include any mental limitations in the hypothetical question to the vocational expert. Thus, it appears that the ALJ used the appropriate grid rule and properly evaluated the RFC of the plaintiff.

## IV. RECOMMENDATION

Based upon the foregoing, **IT IS RECOMMENDED THAT**:

the plaintiff's appeal from the decision of the Commissioner of Social

Security, (Doc. 1), be **DENIED**.

> *s/ Malachy E. Mannion*
>
> **MALACHY E. MANNION**
> **United States Magistrate Judge**

**Date**: February 25, 2011

O:\shared\REPORTS\2010 Reports\10-0423 HHS.wpd